May it please the court. This is a fraud case that the jury deliberated as a death case. Even before deliberations began, jurors discussed extrinsic claims that the defendants had killed nine people, concluded that the defendants were guilty, and commented that the justice system should, quote unquote, fry them. The jury's prejudgment of the case and consideration of prejudicial extrinsic evidence deprive the defendants of a fair trial, and this requires that the convictions below be reversed. Additionally, Michael's sentence should be vacated because the government failed to carry its burden of establishing the loss amount with reliable and specific evidence. The only evidence adduced to establish the loss amount was a summary spreadsheet that the government did not understand or verify. Michael's sentence should also be vacated because the government failed to establish that he supervised or managed any co-conspirator. Under the Sixth Amendment, a jury's verdict must be based solely upon evidence to develop a trial. A new trial is required when a jury is exposed to extrinsic evidence and the exposure is not harmless. Before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. Factors to determine prejudice include the nature of the extrinsic evidence, the manner in which the information reached the jury, the factual findings in the district court and the adequacy of the investigation, and the strength of the government's case. The district court here held that the defendants failed to demonstrate that the jury was exposed to extrinsic evidence at all. However, the record does not support this. The record shows, and the government implicitly concedes, that the jury was, in fact, exposed to extrinsic evidence. In addition to Juror 34, the record shows that Juror 37 and Juror 10 unequivocally testified that other jurors spoke during the trial about the defendants causing death. When we're looking at these claims, there are several factors we're supposed to look at. So, even if I were to assume that there was exposure, contrary to what the district court found, how do the other factors weigh? For example, the manner in which the information reached the jury. I mean, it came from family members. I mean, there wasn't anything that exposed all the jurors. Am I right about that fact? Well, with respect to some of the jurors, especially Juror 35, it's not exactly clear where she obtained the evidence. But the way that the cases have lined up, I think specifically, this isn't a case like United States v. Dorch, for instance. In that case, the evidence was mistakenly introduced to the jury by the district court. Here we have a case where the jury actually brought the evidence in themselves. And so, the question is really, is really, is how did the jury get the information? And it's the difficult or the harmful part is when the jury itself goes out and finds information and brings that in themselves. Which didn't happen here, really. I mean, these people were just exposed by their family members, as I understand it, right? Well, they were exposed by Juror 35. It's not exactly clear where she got the information. But she brought the information in herself and exposed other jurors to it. Counsel, I've read the entire voir dire, start to finish. I have one problem that either you or the government can answer, or one of your colleagues. I understand how the court struck the jury, but there's nothing in the record that tells us who was in that list that was struck down to the jurors. But aside from that, five of the people who testified in chambers about knowing about the case were on the jury. Two of them, 34 and 37, knew about the deaths. They knew about deaths when they told the judge in chambers, and they said the same thing effectively in the hearing that the court conducted post-trial. And half of the alternate jurors also knew about Salmonella and about the case. And I'm assuming that when they were summoned to come to court, that a lot of them, by the time they got to the courtroom and before the court ever described what was in the indictment, and the court read the whole indictment to the jury, including that Salmonella was life-threatening, I assume that most of the panel had some knowledge through television or the newspapers, that's what most of them said. Or a family member told them or something or other. Well, jurors 34 and 37, in fact, they stated that they did not have any knowledge about it. 37 stated in chambers that there had been death. And 84 also said the same thing in chambers. They were selected. But stated that they heard things during voir dire, yes, from other people that had been saying things. Well, I don't know where they heard it, but they came to court having heard that the Salmonella caused death. Those two said that. The other three that were on the panel knew about Salmonella and the sickness and whatnot. They didn't say anything about death. Right. Well, I'm not sure what my brother said just now, but he may have said this, and this concerns me. You knew, because it was revealed in voir dire, that two of the jurors were aware that there had been deaths, and you nevertheless did not strike them for cause, and you did not strike them with your peremptories. Well, there was one. Number one, is that not true? That's not completely accurate, Your Honor. One juror, in fact, juror 138, stated that he knew about, or I believe it was a female, believed that she stated that she knew about the deaths, and the defense counsel actually moved to have her stricken, but the district court denied the motion. Jurors 112 and jurors 116, they reported hearing about the deaths in contrast to what the district court said. The district court, in its opinion, said that jurors 112 and jurors 116 reminded the court that they had spoken during voir dire about the deaths, but that was inaccurate. In fact, jurors 112 and jurors 116 never disclosed during voir dire that they had heard about the deaths. I think that is true, but nevertheless, there were two jurors, I think, who revealed during voir dire, in the individual voir dire with the court, that they knew that there had been deaths, and you did not strike them. Is that true, or is that not true? You know, I don't, I don't, I'm not exactly sure. You should know the answer to that. Well, I don't, I think that what happened was that the jury believed that they were out of What I understand from reading the record is that juror 138 stated that they were aware of deaths, and defense counsel did move to strike them, and they were, they were still nevertheless allowed to That's one of the problems, we don't have a list in the record of the binary that was qualified and from which the jury was struck. The transcript, I've tried the district judge cases in Georgia, so I know how they pick the jury. They had a silence that passed the sheet back and forth, but we don't know what was on the sheet. All we know is who wound up on the jury. So it'd be very interesting to know how many of the group that was struck down had been before the court in chambers and knew about Salmonella. But that's But there's no question that these two that Judge Anderson just mentioned said that they knew about deaths, and there was no motion to strike either one of them for cause in chambers, and they weren't challenged prematurely in the striking down. Well, but the analysis really gets to, I think what we have to look to is focus on juror 35. Juror 35, independent of these other individuals who may have had some knowledge of Salmonella, and you're right, the records that's just simply the way that it works in the district court. Sometimes you just don't have the records clear as exactly what happened during Voidere. But what you have is you have juror 35 who independent of this told, and this is absolutely clear from the record, juror 35 stated during Voidere that she did not know anything about deaths, did not really did not know anything about the case. But then when she was sitting on the jury, and this was verified, this was corroborated by several witnesses, that she stated throughout the trial and during deliberations that you, I think, quote unquote, you know them people did this, you know these people are guilty, these people caused deaths. She stated clearly, and there were nine people that died, that she knew the number of the people who had died. Very specifically, and this is independent of anything else, of any other knowledge that any other jurors had. And juror 37 acknowledged this, juror 34 acknowledged this, and affidavits. Juror 93 also said that evidence of deaths was the number one piece of evidence that influenced his decision. Juror 93 said it was common knowledge of deaths. That's why my question seems to me to be significant. I think the district court was clearly erroneous about their exposure. I think the jurors were exposed to the fact that the Salmonella outbreak had caused deaths. But the crucial issue in this case, on this issue in my mind, is whether or not the government has, the government did persuade the district court in its alternative holding, that it was harmless beyond reasonable doubt. Analyzing those four factors, and it is significant to me that with respect to the first factor of prejudice, that you actually took jurors whom you knew were exposed to death, which says to me that everybody knew that the jurors were going to know that there were deaths, and therefore it's not highly prejudicial. So while that first factor favors you slightly, weakly, it was not highly prejudicial so that it favors you only weakly. Whereas number two, the second factor, the way in which the evidence of deaths got to the jury was under all of the testimony, uh, even accepting 34 as credible, which the district court did not. It was fleeting. It was not actually discussed as part of the rationale. It was just, and some of the jurors, a good many of them, in fact most of them, did not even know about the deaths so that it was not discussed. In other words, it was fleeting. The third factor about how the district court handled it, and he did investigate very thoroughly, questioning each juror out of the presence of everybody else after trial. And I can't remember the fourth one. What's the fourth factor? Well, the fourth factor is the strength of the government. Which is overwhelming with respect to Stuart and Michael, uh, and with respect to Mary Wilkerson. You know, she's not nearly as guilty or culpable. She's guilty. But, uh, I mean, it seemed pretty clear to me that she did know that there were positive tests. There were two emails in June and she said she didn't. And so it seems to me the evidence that fourth factor is pretty strong against the defendants. Well, I'd say that the fourth factor is not necessarily as strong as I think the government represents because there was no individualized assessment of the evidence regarding each specific defendant. And the evidence regarding Mary Wilkerson, you know, I do not believe, I will disagree. I believe it was not overwhelming. I think that it was, um, it was the statement. It was overwhelming that she knew in June about the positive test. Is that not true? Wow. There were two emails that said that from her. Right. But, but regarding the, I believe that that is, that is accurate. But whether she, in fact, was stated anything falsely to the agent, um, that's simply a he said, she said. I know you don't represent her, so I'll save that question for her lawyer. Yeah. Yes, your honor. I understand. Um, but I see that my, um, my time is up and I will, um, save the balance of my time for, uh, for rebuttal. Thank you. Mr. Lugar. May it please the court, Justin Lugar for appellant Stuart Parnell. The district court committed clear error in applying a 26 level loss enhancement under section 2B1.1 of the sentencing guidelines. This unsupported enhancement increased Stuart's by roughly 25 years. Remarkably, the district court confirmed its own clear error in adding 26 levels to his sentence by finding that the government's evidence of loss, quote, provided an insufficient basis, end quote, for determination of monetary restitution at a subsequent hearing. Well, you have different standards there. You realize that? And the difference in the standards, however, in this case are a difference without any meaning. Um, the district court in this case adduced that the evidence for loss purposes under 2B1.1 was an actual loss determination, not intended loss, not intended gain. And so, the fact that there's no other relevant conduct at play, there's no other issues at all outside of determining whether or not the losses at issue had been proven as direct losses rather than determination and restitution in this case. I thought the difference that the district court drew in docket 619 was that he couldn't tell what amount of the losses were consequential losses, i.e. tort damages. As I read 619, that is the only ground on which he distinguished the losses in the loss calculation from the restitution calculation. Am I not correct? You are correct, Your Honor. However, the- That's absolutely correct. We agree with that. I don't see how your argument about he found the evidence inadequate for restitution helps you at all. Well, the difference is that in finding that actual, under the sentencing guidelines, he found actual loss, but the evidence presented to the court by Special Agent Allard and through the government, it was parsed out into three different categories. She delineated between these different types of losses. And unlike Alan Maxwell, who testified about individual losses, who actually reviewed records, medical records and others of the like, and engaged in a highly analytical process to determine the number of individuals that were affected from a medical perspective in this case, for the corporate losses, there was absolutely no analysis done entirely different argument from your, what I call your restitution argument. You're arguing now that the evidence was not sufficiently specific and reliable. Well, it's both. First, the restitution- Okay, well, I'm on the restitution in my question. And my question to you was that being what I talked about, the tort damages, the reason the district court found the evidence insufficient for restitution, that says nothing at all about the loss calculation. Is that not true? It would if there were actually consequential and indirect damages included in the loss calculation. In this case, the Special Agent Allard- I've seen that. And it is, I think the district court could have found restitution because there was ample evidence that clearly did not involve tort damages. And he didn't, and that was to your you could speculate that he had some reason other than the tort damages that he talked about, but it would be entire speculation because that's what he said in the restitution docket 619. He said, I can't tell because they're tort damages. Well, and we would say that the record demonstrates that he could tell and that they're very clear from Agent Allard. The one thing she did very clearly in her chart and her summary evidence of loss for guideline purposes was she set out direct loss or actual loss and then she offset it with lawsuit losses and with other consequential damages such as insurance recoveries. And so on the face of the documents presented by the government, the summary itself, it's right there on the face. So to say that you couldn't determine whether or not for restitution purposes there were consequential or indirect losses included is just simply incorrect as based on the record. And so then we're stuck with the evidence providing an insufficient basis. And the restitution challenge has not been, or the restitution decision has not been challenged by the court here. First of all, when they didn't tell the district court, there was plenty of evidence that did not involve tort damages. But if I were you, I'd get on to your specific and reliable, which is a little stronger point. And so the evidence standing alone was unreliable, lacked specificity as required by the law, and was insufficient as a whole to support Stewart's guideline enhancement. Agent Allard confirmed in her testimony that she did absolutely nothing at all to verify or analyze the losses. Instead, she just parroted summary evidence. She just read into the record certain summaries that she came up with and did absolutely no independent analysis to confirm. I'll tell you what really bothers me about this argument from your standpoint. It is true, especially the Kellogg damages was just a one-page summary. But on the other hand, you look at that one-page summary and part of it is absolutely clear that it is appropriate losses. For example, recalled net sales value $5.3 million in 2008, $5.1 million in 2009, that's $10.4 million. Recalled costs $2.8 million in 2008, $1.3 million in 2009. Inventory that was lost, $10.3 million. That and at $20 million, it would be futile to send this back because your guideline would be exactly the same. Yes, we recognize that. However, the evidence that was adduced and under the standard, it has to be something more specific and reliable than just a summary chart. Perfunctory summaries, as this court has previously ruled, are not acceptable as reliable and specific evidence for loss purposes. Here, you have not a single underlying document, no invoices, no understanding of the methodology or the approach that Kellogg's in this instance took towards assessing damage or loss. The same is true for ConAgra. That's a little over $40 million. There's a four-page summary PDF document that just lists totals. It doesn't explain anything about where the loss has come from or that they were related in any way to this salmonella outbreak. I wanted to ask you about your argument on the Hartford insurance policy, which is about a $14 million. I believe it was about 12, plus the attorney's fees. Can you just summarize what your argument is on that? I'm not sure I understand. For the Hartford policy, it was a lawfully acquired policy. There's no ruling or anything about insurance fraud or that this policy somehow did not pay off. But you say it didn't count because... It was an offset. It's more akin to a restitution-type issue than it would be under the loss calculation. Did you produce a copy of that policy to the court? I don't believe there's a copy of the policy that was entered into evidence in the case. Even though the injured parties were reimbursed, there was a loss to the insurance company, wasn't it? That counts just as much as any other loss. Right. We wouldn't disagree with that, that it could, but there was no... As the steward and Mayor Wilkerson, you had the Hartford $12,750,000 plus Abbott Laboratories, which was $13,624,000, which totals $26 million, which is more than enough to make it futile to remand. Yes, Your Honor. The restitution issue being inconsistent with the findings on the same evidence. That's why the restitution argument is... That's a dangerous argument for you. I see my time is up. You'll have a chance to come back with rebuttal. Second. To please this court, the government... I would refer the court to the government's policies, the Department of Justice's policy as to the use and the providing discovery concerning electronic technology. I would go to page 13 of the recommendation for electronically stored information that is the policy of DOJ. The paragraph E on that page talks about the various types of E discovery, electronic discovery, image, and load files, and native files. Paragraph H, in talking about load files, says that load files must be obtained and provided in software-specific formats to ensure they can be used by the receiving party. Ms. Wilkerson, on the initial appearance, I went with Ms. Wilkerson. We entered our not guilty plea. I was immediately given a box, a box of disk. There may have been some tapes in there, but I think it was mainly disk. I didn't know what I had. They told me I had several million documents or pages. I took that box back to the office and put it on the disk and wasn't sure what to do with it. Well, that two million estimate during the course of my representation of Ms. Wilkerson came to between eight and five million pages. I had a young man that took care of my computer hardware. He did not know anything, to speak of, about software, and I didn't either, and I still don't. But the policy of the Department of Justice is to, when you provide discovery, e-discovery, that you've got to be sure that the receiving party can use it. May I tell you that there were between eight and 15 million pages, most of which I'll never be able to access. There's three types. One is machine talking to machine, computer talking to computer. It's a tool, maybe image, and that could be an actual picture. That I can understand, but I don't know any software that can take you to that. Let me tell you my problem with the argument you make along this line. Number one, the district court made a finding of fact that the information produced by the government was unsearchable, and so you've got to persuade us that that finding was clearly erroneous. He made that finding in this hearing after the July 3, 2014, motion that you made. In addition, you got the Bates Index in December of 2013, so you had half a year or more, a little more than seven months to use that. And the third thing is, I haven't personally, but my law clerk has searched the while you did ask for funds for an IT consultant, and you let the district court know you were having trouble, but you never said to the district court that it was not searchable. If I may address, first of all, what we call the native file trial schedule for July the 14th of 2014. On June the 30th of 2014, the government mailed 100,000 images, or not images, but documents, and I assumed that I probably got them around July the 2nd, and I immediately filed a motion. There was a hearing on July the 11th concerning that issue, and I believe the other two defendants joined in. The lateness of that also was an issue of providing that. The main grievance counsel, it seems to me, is against the district judge. He didn't give you enough continuance. Two-week continuance. Court granted a continuance, and so it was in the court's bosom to grant more relief, depending on what you told the court. The court granted a two-week continuance, and the 100,000 files did not have what's called database. Now, as I stand before you today, I can't really still tell you anything about database, except I believe it is a software that interfaces the other software with the hardware. That 100,000 had no databases, and Mr. Hearn was there, and he assured us that we could do it like he did it, read it page by page, but I'm a slow reader. I couldn't read 100,000 pages in two weeks or four weeks. I haven't read it yet, because we have no databases. The 100,000 was totally unusable to us for the most part. Now, I have, in talking to the young man that handled the computers for me, there are some ways, it's a slow process to read it page by page, but this was given to us as jinxed material. It surely was not jinxed material. It was discoverable material, and quite frankly, it was braided material. If I may, I want to give you an example. Exhibit one, we found that two years after it was given to us, early part of July of 2014, there was emails from Heartline, the FDA agent in charge to FDA agent Gray, who actually closed down the plant, and in there, she acknowledges, she gets confused. She's trying to reconstruct what happened because they had to prepare a report for Congress. There was a congressional investigation ongoing concerning this matter. That would have been exculpatory. That would have been so important if Ms. Wilkerson had had that to argue the credibility of the case, to argue or to cross-examine FDA agent Gray, as well as Heartline. It was not a situation of where we were not being diligent. It was a matter we could not access the 100,000 documents because they had no and still have no databases. I would say also that we have document 552, page 106. The judge, when he got us together, I believe it was on July 11th, Judge Sands, he said, and it is stated in document 552, page 106, that the court found arguable some impeachment material. This was not jinx. This was discoverable. I understand your point. I have one question on another matter that I was about to ask your co-counsel, but it relates to your client. Your primary argument, it seems to me, that there was insufficient evidence or very weak evidence, which is relevant to the extrinsic evidence issue. Your primary argument is that the question by agent Gray was whether there were any positive results in January of 2008. It seems to me the problem with your argument is that there is simply no evidence at all that the question was limited to January of 2008. The Gray testimony clearly says that she asked you the same question she asked Stewart and Lightsey, namely, if there were any other positives in 2008, no limit to January of 2008. The email from Gray to Erica Anderson said if there was any positives in 2008 going back to 2008, there was no evidence at all to support your argument that the question from Gray to your client was limited to January of 2008. Do you have a response to that? If I'm not mistaken, I believe that there was a telephone call from Agent Gray. She was talking to Stewart Parnell. I believe he said somebody down there would know words to that effect about the positives. I believe she talked to Lightsey as well. It would have to be in there. Perhaps when I come back, I can find it and cite you to it. I believe that Agent Gray had been January 2008. I doubt that is true because Lightsey had already told her about three positives. None of them were in January of 2008. They were all later in the year. That's correct. He came to work in the summer of 2008. Our interpretation of the situation is that Wilkerson was saying, I don't know, because she was referring to January of 2008. She became... I understand that was your argument. I think my guess is what you were trying to do was to confuse the jury. That was good strategy in the trial, but the jury was not confused. They held against you. There's simply no evidence to support your argument on appeal that that was the question. If I may, I can add nothing further along those lines. I would say in response to that, I think it is probably more direct that this Brady issue, there was exculpatory evidence in the $100,000 that was given to us in the early part of July of 2014. That's the most important part to me of my argument. I would concede that and acknowledge that. You say some rebuttal time. You're through with your argument on direct. Thank you. You had some rebuttal time. Thank you. Mr. Romano. Good morning. May it please the court, John Alex Romano on behalf of the United States. The district court's rulings in this case were correct and well within the bounds of its discretion. The judgments below should be affirmed in their entirety. I'd like to begin by addressing the district court's denial of the new trial claim alleging juror exposure to extrinsic evidence. That ruling was not an abuse of discretion. Before I address the absence of prejudice from any exposure that occurred, because we do believe the record is quite strong on that, I would just like, with the court's indulgence, to walk through different areas of the record. We do say the evidence is quite strong on that, that there was jury exposure. No, no. The evidence that there would be no prejudice from any exposure that occurred. But there seemed to be exposure to me. And with the court's indulgence, I'd like to just walk through different areas of the record, because the government certainly disagrees with the defendant's characterization of what the record shows as to exposure. Let's begin with the source of the allegation of juror misconduct, Juror 34. The district court made a permissible negative credibility determination as to Juror 34 in finding that she was biased. And that is supported by the record, by Juror 34's own testimony. She was emotional and upset when she, on her own accord, approached Mary Wilkerson after trial at a school or community soccer game and told her that she had prayed for her during trial, that she felt that she had done everything that she could. So the district court reasonably found that Juror 34 felt responsible for Ms. Wilkerson's, the outcome of her case. And that expressed bias affected her credibility as a witness. The district court also found that the testimony that Juror 34 offered at the post-trial hearing was vague and generalized. And we know, in fact, that key portions of Juror 34's testimony lacked corroboration. For example, her testimony that during jury selection that Juror 35 said that the defendants were guilty because nine people died in connection with the conduct in this case. No other juror corroborated that. No other juror corroborated Juror 34's statement that jurors said they had performed independent research. There's no corroboration of that. So we would submit the district court was well-advised, right, as the finder of fact to make a negative credibility determination at the Juror 34 and to set aside her testimony. The district court also did not clearly err in making its findings at the extent to which and the context in which deaths were mentioned during deliberations. And just to recap, I know the court is familiar with the record, but the district court found that during deliberations, the only way in which deaths came up was based on a mistaken recollection of the Juror 12 testified to. He testified to that during deliberations, Juror 35 said that 700 or so people had died. And Juror 12 interjected and said, no, that 700 number that you heard, that was a reference during the evidence to the number of individuals who were sickened during the outbreak of San Bernardino. All of what you're saying is true. And I think probably there is enough evidence to support the district courts finding a fact that Juror 34 was biased and therefore warrant justified the district courts discounting that testimony of 34. But there were four other jurors who said in the post-trial examination and chambers by the district court that death was mentioned. 37 and 10, that death was mentioned before deliberations. Four and 12, that death was mentioned during deliberations. So it seems clear to me that there was exposure. If I were you, I'd spend the rest of my time on prejudice, but I'm happy to know. Is your reading of 37 and 10 and four and 12 different from mine? Only on four and 12. I think four's testimony is consistent with what 12 testified to, that to the extent death came up, it was based on a mistaken recollection of the evidence. I did not get that. I thought that ruling was clearly erroneous too, because although 12 said that, nobody else did. True, but Juror 4 did testify that there was a he said, exchange, which should be fully consistent with what Juror 12 testified about how it came out. That's a minor point though. Agreed, Your Honor, and I'll turn to prejudice. I don't disagree that during the pre-deliberations period, there is testimony, as Your Honor stated, that Jurors 37 and Juror 10 testified to the mentioning of death during that period. But turning to the factors that this court looks at in deciding whether or not the presumption of prejudice to the extent it attaches is rebutted. We think all of the factors here point in the direction of refining of no prejudice, beginning with the nature of the information here. These were general passing references to death that were mentioned to the extent they were mentioned. I think the district court got it right in pointing to the fact that the defense did in fact in panel two jurors, Jurors 37 and 84, who indicated during voir dire that they knew that death had occurred during the Salmonella outbreak. That is absolutely true that they disclosed that during voir dire. The defendants did not move to strike those two jurors for cause, did not exercise their preemptory challenges as to those jurors, and the district court was right in its ruling in stating that by reserving objection the defendants passed to these jurors in such a situation, it serves as a tacit admission that knowledge of death standing alone does not necessarily render a juror incapable of making an unbiased determination of guilt. That is page 22 of the ruling that is document 397. And the jury also heard admissible evidence during trial about the number of individuals who were sickened during the Salmonella outbreak, the effect that Salmonella poisoning can have on individuals. It heard from an individual who got sick from eating a package of Kellogg's crackers. So all that evidence was admitted at trial and it was admissible. So here the passing references to death to the extent they occurred during the pre-deliberations period and possibly the deliberations period was not inherently prejudicial. And it is important to bear in mind, as I think some of the court's questions posed to my counterpart went, that the way in which this information came out. This is not a juror who had been exposed to a fresh media account during trial of death in connection with this case. This is some pre-existing knowledge that some number of jurors had about death in connection with this case, but again very generalized. So the way in which the extrinsic evidence was mentioned was not inherently prejudicial. Third, you have the evidence of guilt supporting the counts of conviction. It was indeed overwhelming. That was a finding that the district court made in its post-trial. I agree it's overwhelming with respect to Stuart and Michael. I'm not so sure with respect to Mary Wilkerson. She, I think there was ample evidence that she was guilty, but it was one question. The lawyer tried valiantly to confuse the jury that maybe she did mean just January 08. And she did say, I didn't know about that because I wasn't QA at that time. I wasn't the quality administrator at that time. But of course, we know she did know and she went on and said, I know of no positives. But it was, she argues, and I think a better argument is that it was a more casual statement. So I don't think the evidence is overwhelming for Mary Wilkerson. A couple of points on that, Your Honor. It was, of course, a two-party conversation. So Investigator Gray would have been the only other witness to that conversation. And when the defense, you know, Investigator Gray's credibility was brought forth before the jury. That was on cross-examination. There was that suggestion that she was lying about whether that conversation occurred. And the jury rejected that argument. And in fact, there is on rebuttal, given the attack on Investigator Gray's credibility. But if the jury, I don't think there's any question about sufficiency. But if the jury was tainted with extrinsic evidence of deaths and the government's got the burden of proving beyond reasonable doubt that it didn't make any difference. I would say one other thing, which is that the jury returned a split verdict as to Mary Wilkerson. So that, I think, indicates that, in fact, they returned a split verdict after delivering for four days as to each of the defendants. So I think that shows that the jury was not a jury that was returning a verdict based on passion or prejudice. It was doing what we asked juries to do. It was parsing the evidence as to each count, as to each defendant. And I think that shows that the jury held the government to its burden of proof. Wasn't that other one, though, kind of a slam dunk? Because they found that, I forget exactly what happened, but they found that it wasn't positive or something. What was that? It concerned the whereabouts of something called the COA log. Yeah, yeah. And they did have it all along. And the jury chose to disbelieve it. But I think the point of that, it shows the deliberative process that the jury undertook. It evaluated the evidence as to each defendant, as to each count. And I think the court can also look at the thoroughness of the district court's investigation. Despite the critiques leveled at what the district court did here by the appellants in the common brief, it examined all 12 jurors under oath, all six alternate jurors. It asked detailed follow-up questions, all of which went to the extent to which there was any exposure to extrinsic evidence. And I would just reiterate that we don't think there was much. And a whole lot of evidence that most of the jurors had not even heard about death. Correct. Nine of the jurors who deliberated testified that they did not hear a mention of death. It's only Juror 34's discredited testimony, which the district court was in its right, we believe, to set aside. And then, of course, you have the Juror 12 issue as to how it came up during deliberations with Juror 4. And then you have two jurors, 37 and 10, who testified that it came up during pre-deliberations. But even there, their testimony about how it occurred is very vague. There's no indication that there was really an elaborate discussion of death. So given the district court's investigation that it undertook, the strength of the government's evidence, including we would submit respectfully as to the count on which the jury convicted Mary Wilkerson, and the nature of the extrinsic evidence to the extent the jury was exposed to, we think all these factors point in the prejudice. And we'd ask the court to conclude that the district court did not abuse its discretion in denying the new trial claim alleging juror exposure to extrinsic evidence. On that point, can you tell us whether or not the record contains the list of the married persons from whom the jury was struck? If I'm understanding the court's question, it is whether it contains information about you had a list. It passed back and forth. That's how it was struck. I'm not recalling offhand. I'm happy to check on that question and submit a record of it. The record simply shows the results of the strikes. And it also shows how many strikes there were. But it doesn't tell us anything at all about who's on that list. And then specifically, whether more persons were on the list than wound up on the jury who knew about Simonella. You're right. I don't know if the record contains that detailed information. Also, top of my head, I'm not recalling that it does. Well, it ought to be a matter of the court record, it would seem to me. I'm sorry? It ought to be filed. Correct. I mean, certainly there's the transcript of the Wardeo that Your Honor is familiar with, which would reflect motions to strike for cause being made. But as to the particular list Your Honor, I don't know the answer to the court's question. I'd like to move now to the claim of prosecutorial misconduct made by Ms. Wilkerson on appeal. There was no abuse of discretion by the district court in its many rulings rejecting this claim that the government violated its discovery applications. And the claim on appeal is twofold. It relates to the timing of two productions made by the government in June of 2014. And second, more generally, to the volume of documents that were produced by the government during discovery in this case. Did you give identical packages to each of the defendants? Yes, Your Honor. I believe we did. And let's begin with the June 2014 production. There was no Brady violation here because the information was turned over for trial. And the district court, out of an abundance of caution, granted a two-week continuance to ensure that the defense had adequate time to review it. And it's important to keep in mind that one of the two productions was Jenks Act material that was produced by statute. It didn't have to be produced until before trial. And the timing of that production did not violate any district court order. Even that Jenks production, the way it was produced, it was segregated in the electronic file. There were witness folders. So the documents were segregated by witness. So it was fairly easy to navigate. So our argument as to the June 2014 production, one, is that there was no suppression because it was produced in time for its proper use at trial. And in fact, we know that some of those documents are admitted as evidence at trial. And second, even if the court were to somehow find a suppression here of documents for Brady purposes, the documents were not exculpatory or certainly not materially so within the meaning of Brady. And I'd like to focus on the one document that my counterpart, Mr. Ledford, referenced. And that is the email that is titled Exhibit 1. It's in his appendix at, I think it's PDF pages 552 to 553. It's this allegedly exculpatory. I'm sorry. I don't recall which volume it would be, but it would be, unfortunately, as I downloaded it, I downloaded it into one large electronic file. So I know the PDF numbers for those pages were 552 to 553. And it's titled Exhibit 1, Exculpatory Email, FDA Heartline to Gray. The email is not exculpatory. If anything, it's inculpatory because it shows Janet Gray in her email. She's referencing the false statement that Mary Wilkerson says. And she does it in a way that's fully consistent with her later trial testimony. She says, when I asked Mary, she said she did not handle that area and she was not aware of any positives. Janet Gray testifies at trial that Mary Wilkerson says she was not aware of any positives. Was that a part of the June 14th production? I believe it was, yes. June 30th. It was 14th. I believe, no, I believe it would have been in the GenCac production, which was the later production. June 30th. I believe so, yes, Your Honor. It's not clear if this document was ever filed in the district court, but, I mean, it is included in the appendix that Mr. Lester So repeat that, Gray in the email was telling Heartline what? When I asked Mary, she said she did not handle that area and she was not aware of any positives. So the thrust of what Janet Gray is saying in this email is that Mary said she was not aware of any positives. That's consistent with what she testified to. So even if the court were to find suppression from within the meaning of Brady as to these June 2014 productions, there's no materially exculpatory evidence that is in there. As to the second discovery claim, that is the volume of information or documents that the government disclosed. Oh, and my apologies. If I can just circle back and make one point in rebuttal concerning the June 2014 production, there's not 100,000 documents. That 100,000 just refers to the different electronic files that make up a document. There were less than 4,000 unique documents in the June 2014 production. I have 5,628 pages. Is that about right? For one of the productions, yes. For June 14. That is consistent with my recollection. Yes, Your Honor. And then sometimes I have pages, sometimes I have documents, but June 30 was 3,700 documents? Correct, but a fewer number of pages as far as my recollection goes than the earlier June production. And as to the second discovery claim, that is the volume of the government's production. The government did not engage in a data dump here to try and conceal any documents. There were a lot of documents in this case. There's no question about that. But the government took a lot of steps to help ease the burden. It made its first discovery production within two weeks of the indictment being returned. That was a large production of documents. It made productions throughout 2013. At the end of 2013, it produced a helpful index for the documents to help the defense navigate. You gave them that index in December of 2013? That's correct, Your Honor. Did thereafter, did the attorney for Mary Wilkerson claim that she could not search the production materials? I'm not aware offhand, Your Honor, that that claim was made. Certainly, as the court indicated in questioning Mr. Ledford, there was a determination by the judge that the material was searchable. I'm not aware of any claim by counsel that the material wasn't searchable. I don't want to rule it out, but it answers your question. I don't recall any. No. And certainly, that is a determination that we ask district courts to make. It's sort of close to discovery issues. So it determined that there was no prejudice to Mary Wilkerson by the volume of discovery in this case. Among other reasons, the court looked at the fact that Wilkerson's legal team had the assistance, or Mr. Ledford had the assistance of an IT consultant who provided 268 hours of assistance. That's almost seven weeks of time. The court also indicated, I believe, that Mr. Ledford had the software, the confident software that allows electronic discovery productions to be searched. Now, it may be the case that Mr. Ledford or his IT consultant was not able to use that software as perhaps as effectively as it can be used, but that doesn't amount to a Brady violation. And the district court is best positioned, we would submit, to evaluate these types of issues, and it found no prejudice here from the government's production of discovery. I'm happy to address the sufficiency of the evidence if the court has any more questions about it. We do believe that Janet Gray's testimony was clear as to what question she asked Ms. Wilkerson. It was, quote, if there were any other positives in 2008. And Gray testified that the response from Ms. Wilkerson was, quote, she told me she was not working QA beginning of the year, and she was not aware of any positives. Nowhere in the question by Investigator Gray is there a reference to only wanting to know about knowledge of positive salmonella results in January of 2008. And certainly, that's only a question of fact for the jury to decide. And of course, there is ample evidence in the record indicating that Ms. Wilkerson knew about positive salmonella results in 2008, including the two emails, one of which is Government Exhibit 40-01, where Ms. Wilkerson is writing the operations manager of PCA's plant in Plainview, Texas. And Ms. Wilkerson writes, quote, we have a problem with the granulation line in salmonella at least every other week, if not every week. But when retested by a different lab, it comes back OK. That's a June 30, 2008 email that was introduced in evidence. And of course, as we've argued in our brief, there is other evidence supporting the jury's determination that Ms. Wilkerson did, in fact, know about other positive salmonella results in 2008. Unless the court has any other questions about the individual claims brought by Ms. Wilkerson, I'll turn to the sentencing issues, beginning with the guidelines question of guidelines calculation made by the district court. If the defendant had asked, if Mary Wilkerson had asked for a severance, the district court probably would have granted it, would it not? John, I can't say what the court would have done. We know that Ms. Wilkerson made only a one-sentence throwaway request for severance, and the court found that insufficient. It wasn't briefed, so I'm reluctant to speculate on what the court would have done. We certainly know here from the record that there was no prejudice from the fact that her case was joined with that of Michael Parnell and Sore Parnell. I think probably there's some truth in what you say. All of the evidence would have been admissible as a motive for her to lie. On the other hand, I doubt the judge would have allowed seven weeks of such evidence. If we're just talking about a trial of Ms. Wilkerson on the instruction count, I take Your Honor's point. But there was a factual nexus, right? The lies that were told related to the underlying fraud, and there's certainly evidence that at a minimum Ms. Wilkerson would have lied about the fraudulent practices going on. Wasn't the request that you mentioned, that was made after the deadline that the court had set? For pre-trial orders. That's correct, Your Honor. And that's a plain error review on that ruling, isn't it? Yes, Your Honor. And the plain error ruling would be because it's just a one-sentence request. I believe it was contained in a discovery motion toward the end. So it's, you know, accountable for... To demonstrate plain error review, you'd have to cite something impressive that was right on point. Correct, yeah. Those kinds of things are just not subject to plain error review, really. I mean, proof, I'll put it that way. Correct. I really believe that to the extent there was a case for seventh year, it would not be a clear and obvious one given the factual nexus between the lie that was told and the underlying fraud that was the subject of the trial, or the case against the Parnells. So now you're sentencing issues. Yeah, I'm sentencing issues. Agent Allard, it seems like, you know, she admitted that there were mistakes in the materials that she submitted. And, you know, the government has to give evidence that's reliable and specific. So do you have a problem there? Your Honor, I don't. Because I think the defendants overstate the extent to which or misstate that Agent Allard didn't do anything upon receiving... All right, I mispronounced. I think they misstate what Agent Allard did. I mean, she did testify that she did review this information. We know that she excluded several loss numbers because she found them inadequate. For example, $5 million of loss, that was part of the loss for Conagra that Conagra submitted. She excluded that. We know that she excluded all the loss for one company, Superior Nut Company. Didn't include that because she found the submission inadequate. We know that with respect to, I think it's 148,000 pounds of product in the loss submission of Falcon Trading Company. There was no cost number associated with that, so that got set aside. It is true that she didn't audit these numbers. She did not. But given the scale, and I think it's important to bear in mind the context and the task that Judge Sands ultimately faced in calculating loss at sentencing. The fraudulent conduct in this case resulted in one of the largest recall of food products in U.S. history. Almost 4,000 products were recalled by more than 200 companies. And the government, in trying to obtain evidence of loss and presenting it to the court for guidelines purposes, proceeded in a reasonable manner by choosing the 50 companies that most likely would have incurred the greatest number of the greatest losses in connection with the recall, sending subpoenas to those companies. And the information that was submitted in response to those subpoenas was reliable. Certainly, the submitters knew, they're responding to a federal subpoena, that if they're going to submit false and fraudulent information, that's going to expose them to criminal prosecution. And the a lot of the information that was submitted by these companies, and I believe it's that at page seven of its ruling on loss, if I'm recalling the page number correctly, the court made a finding that a lot of the information was in fact quite detailed. The government submitted the information it received as an exhibit at sentencing, as exhibit number eight. And it consists not only of a binder of materials segregated by company that submitted loss information, but also an that was submitted by the company. So, it's not the case that every company that responded to the subpoena submitted summary information. Some companies did, but even those companies that did were on notice because the subpoena indicated that if you're going to submit summary information, you have to be prepared if called upon to produce a records custodian to verify the completeness and the accuracy of the information. And two, the government also reserved the right in the subpoena to require a company that was submitting summary information to produce backup documentation. So, given the scale of the product recall here, we think the procedures used were reasonable and they did produce specific and reliable evidence. And if I can turn to some of these particular loss amounts that the evidence supported, and I'll begin with the certainly the $45.6 million of loss attributable to Kellogg's is what the enhancement for Michael Parnell is based upon. And certainly that number is also included in the total of loss that's attributable to Stuart Parnell and Mary Wilkerson. And this goes back to Judge Anderson's question. There are a lot of, you know, very obvious categories of loss that would be associated with a product recall that gets you well above the $20 million threshold that's needed to trigger the 22-level enhancement. And we also know that Agent Allard didn't just take this sheet and just include it in the packet that got filed with the court as a sentencing agency, but we know that Agent Allard had a telephone conversation with the lawyers for Kellogg's who confirmed the accuracy of these numbers. We know that a certification was submitted by a Kellogg's attorney shortly before the hearing on loss. Was that telephone conversation with that same in-house attorney? I believe it was either with the in-house attorney who signed the certification, Your Honor, Thomas Monroe, or it was with outside counsel. But not the person who actually prepared the summary. I don't believe it was with the person who actually prepared the summary. Is that a problem? I don't think so, Your Honor. Certainly the lawyers, you know, for Kellogg's, there's no reason to believe that they would be submitting false information or information that they weren't confident in. And I'd just like to respond to one suggestion by my opponents, which is that this single spreadsheet was the only evidence supporting the loss number for Kellogg's because it's not correct and it's not what the district court found. In fact, in the court's written order on loss, the court indicated, I'm just quoting, the court believes that stating that the only evidence available to Allard or anyone else in the proceedings related to this case was a single spreadsheet from Kellogg's is misleading. And what the court is referring to there is that there is other evidence to begin with in the sentencing record indicating that Kellogg's was closely involved with the process for individual victims getting compensated for their claims. Those claims were, of course, paid out by the Hartford Insurance Policy. And if the court looks at the submission by Hartford Insurance Policy, which is very detailed, it's broken down by individual claimant, and then it lists the product that's related to the claimant's injury. And of the 123 claims that get paid out by Hartford, more than 100 of those are paid out as a result of somebody getting sickened by eating a Kellogg's product. Say that again. Sure, Your Honor. I'm referring to document 425-10, which is, as I recall, the submission of Hartford Insurance Company, or it contains their breakdown of the claims that they paid to individual victims who got sickened by salmonella poison. These were paid out, of course, in the bankruptcy proceeding. And it lists each claimant. Let me see if I have the... No, I don't have the document on me. But it does list the individual claimant and it lists... You say you have the document. No, I'm wrong. What did you say? I thought I had the document that I was referring to with my packet of material, but I don't have it here. Oh, that's what it is, document. 425-10. Okay. And it's a submission by Hartford Insurance Company, and it lists the individual claims that were paid, the amount of the claim, the attorney for the individual victim, and it also lists the company whose product sickened the individual victim. And of the 123 claims that were paid out of the Hartford Insurance Policy, more than 100 of those are related to Kellogg's product. And so it was my roundabout of ways... Can I just confirm a record question? Sure. Because it's such a big record. Of course. So Mr. Stewart Parnell's lawyer says the Hartford Policy is not in the record. Is that right? The actual insurance policy, he may be correct about that. But certainly what is in the record is a detailed breakdown of the claims that Hartford Insurance Company paid. It has more to do with his argument about coverage under that policy, but if you knew where it was, I would know. Offhand, I'm not aware that the actual insurance policy that PCA had is in the record. Thank you. But my point was just that there's evidence in the record showing the scope of the tainted products that would be out on the market that were tied to Kellogg's that would have to be  filed. Also, my understanding is they didn't get paid 100 cents on the dollars. Also, the 12 million didn't cover everything. That's correct, Your Honor. That is correct. And so how much of the Hartford loss was reflected Kellogg products? Your Honor, I was breaking it down by claimants. So 123 claims were paid out by Hartford Insurance Company. Okay. And I believe it's, I'd like to say 108, but it's certainly more than 100 of those 123 were for people who... It shows the amount. It does, Your Honor. But they also, there's an excess amount that wasn't paid. That's correct. To show the total claim. Was it 79% or something like that? That's correct, Your Honor. Because there was a cap on the policy, the full amount of those claims were not paid out. Was the excess paid by Kellogg? I don't... We don't know that. I don't think the record reflects that. Certainly, that is not included. And to be clear, none of the Kellogg's losses would contain that number. And I don't know whether or not, in fact, Kellogg's paid the difference. I don't see. Well, I can't tell you for sure. I've got docket 405-1, which I think is the one-page Kellogg's claim for losses. Is that right? The actual document number. I don't know if that is the document number. It could be. I'm sorry. And the court said it's not seeing anything. I don't see anything that... I'm sorry. ...reflects... Well, I can't be sure because it does talk about consumer costs, which could be the individual. No, Your Honor. I don't believe any of the spreadsheet which supports the 45.6 million. None of those losses reflect payouts to individuals. That information is included in loss. The Hartford argument you're making now is in addition to the one-page summary that Kellogg's submitted for its own losses. That's correct, Your Honor. And I'm just making the point that there was a lot of tainted Kellogg's products on the market. It's corroborating evidence, basically, is what your argument is. And that's correct, Your Honor. And that is what the district court found on page 6 of document 477. Kellogg's obtained a large quantity of peanut products from PCA. And certainly, there was a lot of trial evidence that would support the amount of product that PCA was selling, the amount of peanut paste that PCA was selling to that division of Kellogg's. And Judge Stantz was familiar with all those documents and the testimony concerning that. With respect to Michael, whose losses would be only the Kellogg losses with a caveat, but with only the Kellogg losses, all he would have to show, all the government would have to show with respect to losses for him is $20 million because that would be the same guideline range that the district court figured was taking the full Kellogg losses. That is correct, Your Honor. And we believe the... So it's futile to send it back unless the defendants can show that there's not at least $20 million losses. I would agree, Your Honor. And that holds true not only for Michael Parnell, but also for Stuart Parnell, because even if he got the $22 million... And even less for Mary Wilkerson. That is correct, Your Honor. Does the court have any other questions about loss or any other claims? And we'd ask that the court confirm the judgment of convictions and the sentences in their entirety. Thank you very much. Thank you. All right. Just a couple of quick points. One thing, one regarding the jury issue. Judge Schoffleit, you were correct that upon further review, Juror 37 and Juror 84 did state during voir dire that they have some limited knowledge of deaths. But the trial counsel tells me, and this isn't in the record, that they were out of peremptory challenges at that point. And the only thing the record shows is that during voir dire, there was one juror that had stated that she was exposed to deaths. And defense counsel did, in fact, move to strike her, but the district court denied that motion. And that's Juror 184. But notably, I think this was most notably, was that all the other jurors, including Juror 35, who absolutely... And there was ample testimony that she did have knowledge of deaths. She stated unequivocally that she knew nothing at all about the case. But throughout the entire case, she was making statements such as, these people are guilty, they killed nine people. I didn't say anything about the word fry except from Juror 37. And you said it was somebody that said that who was not called at all. There was actually... I don't think the fry is connected to 35 at all. Juror 37 stated that there was a group of people, including Juror 35, that made those kinds of statements. And I believe... Well, Juror 37 also said the people that made those statements were not on the jury. And 35 was on the jury. No, no, no, Your Honor. She did say that there were... And I believe that I could give you the record here. She said there was a group of individuals that included Juror 35, a white male, and then a thin black female alternate. And that was the group. That was the bunches that you can look at the docket entry 592 at 3146. Generally, her testimony was there was a bunch of other jurors who knew about the case. These jurors said fry them, said seven or nine people had died and stuff such as this. And this group of individuals, including Juror 35, was that there was a white male and a thin black female alternate. Are the jury questionnaires in the record? These... This is in the record. All of them. The Vennari questionnaires, are they in the record? The Vennari questionnaires, Your Honor, I... How about the questionnaires of those who are on the list that was struck down? I don't believe that's... That list is in the record and we don't have the questionnaires. I do not recall that being in the record. There's no way to match the descriptions with... I don't recall that being in the record, Your Honor. The only record that I know is this Wadeer transcript and we have that one juror... In the selection, which was not in the record. It was silent selection. And my statement to the court here is based on trial counsel's recollection, which isn't in the record, unfortunately. But that was just a recall was that there was... They were out of print for challenges. The docket references you gave me a minute ago about 37's testimony was 592 of 3146. It's a transcript. That's the transcript of the... And, Your Honor, I just want to note that also that makes the characterization that this was fleeting is simply not accurate. The record doesn't reflect that. This was throughout pre-deliberations. So this wasn't such as a... This wasn't just some fleeting statement. This was throughout. May I ask you on your loss amount argument? I'm going to turn to that. As I understand it, Kellogg sometimes called it recalled net sales value and sometimes called it lost net sales value. And you only objected to the lost net sales value. Is that... Because it was a direct... Because that was the amount that was being reflected as to the false amount. And the idea is that... So where would you put the loss amount? Your Honor, we don't know. I mean, I think that it is the government... Agent Allard had no idea what the numbers meant. Agent Allard, the advocate of the evidence, which was a 2000... This spreadsheet was generated in 2013. And, Your Honor, if I may even have the... This is the email. It's at 770. I did this as a PDF. This is the email that was provided by Attorney General Block. It states, in-house counselor Kellogg, they're not sure if this is the final number. But they wanted me to pass this to you so you could see if this is the type of information and documentation you're looking for. And if so, we can get final numbers for all relevant periods and have someone from Kellogg explain to you the spreadsheet. Just to follow up. So you do make a distinction between recalled NSV and lost NSV? Right, because it was supposed to be a direct loss case. And the fact is we just don't... The evidence... My understanding is that lost NSV is sales, estimated loss of sales. Right, net sales value. But recalled NSV is the net sales value of the recalled product. But those are the numbers that are there. But the point is that beyond that, they're just not reliable. I mean, that's it. The numbers on the spreadsheet, they're just not... I understand your argument. I can't tell you. I can't tell you what they mean. I understand your argument that it's not reliable because somebody didn't testify and so forth. But it is clear that recalled net sales value has to mean the actual value of the recalled product. Is there any question in your mind about that? Well, I think that's what it represents. But even Agent Allard admitted there are parts that she wasn't sure about whether those numbers, internal numbers, were correct. So, I mean, if you want to look at the... If you want to take it... If you want to take this evidence at face value, then yes. But the point is, if you look at her testimony, it's simply she doesn't know. And she acknowledges these various mistakes. And then this revelation, which today I hear about the Hartford losses. It's the first time I've heard anything about this. There's no documentation tying a nexus between Kellogg's and this. The diff that the government points to you that had this underlying information for these other losses or for these other companies, there's nothing on that disk for Kellogg's. And the district courts... And to be clear, when the district court was talking about other evidence, what the district court erroneously was looking at was conduct of other people, conduct of the conspiracy, which was over $200 million. But finds that that amount... But still doesn't find that amount is applicable to Michael, just somehow finds that... Right, which is a good thing, but it's just... It shows to show the court how the district court was struggling, struggling mightily, and the government here does too, struggling to try to find a way to justify Michael's sentence. And there's no way to do it. If you look at the record, there's no way to do it. Another point that the court made, the court tried to shift the burden of proof onto Michael and say, well, Michael bore the burden that the court may just look at this sheet and make a determination. And so he should have subpoenaed information from Kellogg and rebutted the government's point. I think what the district court meant there, and I looked at what the district court said, and it's pretty clear. In the very paragraph, almost the same sentence, I think it was the next sentence, he said the government, the burden of proof is on the government. But in effect, he's saying the government has produced a prima facie case, and if the defendant wanted to rebut that, they could have called some of these people. I think that's the gist of what the district court said, which is entirely legitimate and not a shift of the burden of proof. Well, I think it's a very generous characterization of the district court's opinion, Your Honor. I think I would, my reading is a little different, but I still think that it would be an impossibility for the defendant to have done that. I think we have your point and your time's up. Thank you, Your Honor. Mr. Lugar. I just want to follow on from some of the points that Mr. Pope just made on Michael's behalf and explain that the reliability issue with Kellogg's is emblematic of the much bigger problem here for lost calculations, period, for Stewart as well. Even a cursory review of Agent Allard's testimony from the sentencing reveals that she did absolutely no investigation whatsoever, no analysis of the underlying records at all. She summarized and just put information together, but had no idea what the information actually meant or whether it was correct or not. That in and of itself is an indicia of unreliability. Well, with respect to Stewart and Mary Wilkerson, you've got the Hartford loss, which is $12,750,000 plus the Abbott Laboratory loss of $13,624,000, which is more than enough to make it futile to send it back, is $26 million. And my understanding is that Abbott Labs, the Hartford, it seems to me, is clearly okay because the bankruptcy administrator, Maxwell, verified all of that. With respect to Abbott Labs, it's my understanding that it was a fairly substantial documentation, and you don't argue about that at all. No, and the point is that I think the deficiencies in Agent Allard's presentation of that evidence and analysis, or lack thereof, of the evidence in the hearing, it's a pervasive problem that calls into question the reliability of all of the evidence. Just because a custodian signs a document and says, these are accurate, we know from digging into the ones that we did have records of, and this is in the record on cross-examination of Allard, she included amounts and the companies included amounts that had nothing to do at all with this Salmonella outbreak. And there's a massive question about reliability, and it brings me back to this question of, in a civil breach of contract case, for instance, one can't imagine this sort of perfunctory summaries, as this court has called them, being substantial or sufficient enough to prove by preponderance of evidence a loss amount. And so I think that it bears emphasis that in the criminal context where you're talking about, where numbers matter, and this court has said that before in loss calculations, numbers matter, this is just entirely insufficient and unreliable. And we would ask for vacating of Stewart's sentence and instructions not to include the loss amount because they had their opportunity to present it, and they failed. So thank you, Your Honor. Thank you. Mr. Lipser. I would like to address the questions and the rebuttal concerning Wilkerson's charge, count 73, about the positives. And in the closing argument, the transcript, this is Mr. Daschar again. He's told here on page 120 of the closing argument transcript for him that Janet Gray had talked earlier to Leixi, and she asked him two days later if there were any more positives going back to January of 2008. And then further down on the same page, she asked Stewart Parnell the same question, the question being any other positives going back to January of 2008. And then at the very bottom of that page, so Janet Gray asked Mary Wilkerson the same question, and her response was that earlier in the year, she wasn't working in QA, and she was not aware of any positives. She was not in QA until probably around June the 1st, sometime in May or middle June of 2008. She would not have been in a position to know about positives of salmonella testing in early or January of 2008. So she spoke the truth, and she was, in my humble opinion, wrongfully convicted based upon a play of words. If I may, in further rebuttal, the court in document 476, page 8, in the sentencing, Judge Sands said, here, Wilkerson's offense of conviction occurred after the adulterated peanut products were shipped. And he goes on to say, the court therefore finds, no, I'm sorry, the court cannot find that if Wilkerson had not obstructed the FDA's investigation, that the manufacturers and individuals still in possession of contaminated PCA products would not have distributed or consumed those products. I interpret that to mean that, quite frankly, that the time period that the court was talking about, about her conviction, was after the fact, so to speak, or was clearly after the fact, and therefore, it was our opinion and interpretation that she was not to be responsible for any payments or that her sentence would not be enhanced by the losses of the entities such as Kellogg's. Since those would have been after the fact. I would go on to say that there was a question about, did we file a motion, a particular motion, I didn't quite catch what it was, but I can tell you why we would not have. On the last page of document 476, page 9, the judge had granted that motion I had just told you about, Wilkerson's motion to exclude victim testimony from sentencing is granted. But on the last paragraph of that order, he went ahead and went on and said, Wilkerson's motion to dismiss count 73 or an alternative motion for new trial is denied. And then he says, the court finds that Wilkerson's motion, in his document 446, is largely a duplicate of other motions and objections already pending. So, Wilkerson and her counsel or order, an order that is highlighted or in bold, it is refrained from filing further motions that reassert the same claims. So, that would be why I was not about to file any motions that I had already filed a motion previously on. And if I may just briefly conclude in saying, we go back to Exhibit 1, Janet Gray, going back and forth with Hartline, her superior. And she's revising her notes, making her notes. She can't remember what happened back then. And she says, I get confused sometimes. That is exculpatory. It's not jinx material, as was said earlier. This is exculpatory. We didn't get it until two years after the verdict was in. Thank you. Thank you. Mr. Latham, you are court-appointed and we appreciate your having taken the assignment. Thank you, Your Honor. The court will be in recess until 9 in the morning. All rise. Appreciate the help this morning. Thank you. Good job. Good job. Good job. Good job. Good job.